Jeanette **WELLS** et al.

v.

Richard **SCHWEIKER** et al.

**Civ. A. No. 81–4833.**

United States District Court,
E. D. Louisiana.

April 14, 1982.

Sidney D. Watson, New Orleans, La., David Girard, Hammond, La., for plaintiffs.

Paul A. Winick, New Orleans, La., for defendant Richard Schweiker.

Donald E. Puckett, Charles R. King, Baton Rouge, La., for defendant George Fischer.

SEAR, District Judge.

The Omnibus Budget Reconciliation Act of 1981, (OBRA), Pub.L.No.97–35, 95 Stat. 357, was adopted by Congress and signed by the President with the avowed aim of reducing expenditures in a wide array of federal programs. Among the programs OBRA affected most profoundly was Aid to Families with Dependent Children (AFDC), 42 U.S.C. §§ 601 et seq., a state administered public welfare program funded in part by the federal government. In this action, plaintiff Jeanette Wells, a recipient of AFDC benefits, challenges federal and state regulations implementing OBRA, asserting that they were promulgated without compliance with federal and state Administrative Procedure Acts. She brings suit on behalf of herself, her two children, and the class of persons similarly situated. She is joined as plaintiff by the Louisiana Hunger Coalition (LHC), appearing on behalf of its members and all others similarly situated, and by the Welfare Rights and Public Assistance Program (WRPAP), also appearing on behalf of its members and other similarly situated persons. The plaintiffs seek a declaratory judgment determining the validity of the regulations, and injunctive relief against federal and state officials responsible for the AFDC program.[1]

I. *Background: AFDC, OBRA and the APA*

The AFDC program is a venture in "cooperative federalism" designed to furnish financial aid to needy dependent children and the parents or relatives with whom they reside. *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968). Although the program is administered by the states, the federal government contributes substantial funds to states which have submitted "plans for aid and services to needy families with children" conforming to the federal statute and to regulations promulgated by the Secretary of Health and Human Services. *Shea v. Vialpando,* 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974); 42 U.S.C. §§ 601, 602.

OBRA significantly altered the statutory requirements for AFDC plans. The Act tightened income limitations, authorized states to develop work alternatives to welfare, included additional sources of income in determining eligibility, and revised program administration. This litigation was precipitated however, not by these substan-

---

1. Because the issues in this suit are predominantly questions of law, I have incorporated within this opinion those findings of fact necessary to my decision. Fed.R.Civ.P. 52(a). As agreed by the parties, this matter has been submitted for decision on affidavits in lieu of a trial. Decision on preliminary injunctive relief is consolidated with determination of the merits. Fed.R.Civ.P. 65(a)(2).

tive changes in the AFDC program, but by the OBRA's October 1, 1981 effective date.[2] Because OBRA was signed by the President on August 13, 1981, this deadline afforded the defendant Secretary of Health and Human Services (HHS) less than two months to promulgate implementing regulations required by law. 42 U.S.C. § 1302.[3]

Expecting that some change in existing law would be forthcoming, the Secretary had instituted preliminary steps to revise HHS regulations beginning several months before OBRA actually became law. In May 1981, a working group within HHS was established to determine how revised regulations would be drafted and promulgated. Numerous interested groups were contacted in July for their input in developing the new regulations. A preliminary working draft of the regulations was sent to state administrators on August 13, 1981, the day OBRA was signed by the President.

The Secretary approved the draft regulations on September 3, 1981. Pursuant to an Executive Order,[4] the Secretary thereafter transmitted them to the Office of Management and Budget for an assessment of their regulatory impact. On September 21, 1981 interim regulations were published in the Federal Register. 46 Fed.Reg. 46570 (1981). Like the corresponding OBRA provisions, the regulations generally became effective October 1. The preamble to the regulations

stated that comments would be received and considered for sixty days.

Plaintiffs contend that the regulations were unlawfully promulgated because the Secretary failed to follow the rulemaking procedures set forth in § 553 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq. When applicable, § 553 requires that a notice of proposed rulemaking be published in the Federal Register, along with a statement of the terms or the substance of the proposed rule. 5 U.S.C. § 553(b). Following notice, the agency must afford the public an opportunity to comment. 5 U.S.C. § 553(c). Publication of a rule must also occur at least thirty days prior to its effective date. 5 U.S.C. § 553(d).

Conceding that § 553 notice and comment procedures were not observed, the Secretary argues that the circumstances fall within § 553(b)(B)'s exception to notice and comment rulemaking "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." The Secretary further urges that two other exceptions to § 553 are relevant: § 553(b)(A)'s exemption of interpretative rules from rulemaking procedures, and § 553(a)(2)'s exemption of matters "relating to agency management or personnel or

2. Section 2321 of OBRA governs the effective date of its changes in AFDC. It provides:

Sec. 2321. (a) Except as otherwise specifically provided in the preceding sections of this chapter or in subsection (b), the provisions of this chapter and the amendments and repeals made by this chapter shall become effective on October 1, 1981.
(b) If a State agency administering a plan approved under part A of title IV of the Social Security Act demonstrates, to the satisfaction of the Secretary of Health and Human Services, that it cannot, by reason of State law, comply with the requirements of an amendment made by this chapter to which the effective date specified in subsection (a) applies, the Secretary may prescribe that, in the case of such State, the amendment will become effective beginning with the first month beginning after the close of the first session of such State's legislature ending on or after October 1, 1981. For pur-

poses of the preceding sentence, the term "session of a State's legislature" includes any regular, special, budget, or other session of a State legislature.

3. 42 U.S.C. § 1302 provides:

The Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health, Education, and Welfare [now HHS], respectively, shall make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which each is charged under this chapter.

4. Executive Order 12291, 46 Fed.Reg. 13193 (February 19, 1981) requires that the costs and benefits of "major" new regulations be weighed by issuing agencies, and that the regulations be submitted to the Office of Management and Budget for review.

to public property, loans, grants, benefits, or contracts."

Plaintiffs also claim that implementing regulations issued by the state defendant, the Secretary of the Louisiana Department of Health and Human Resources, were promulgated in violation of the Louisiana Administrative Procedure Act, L.S.A. R.S. 49:951 et seq. The Secretary responds that the state regulations were promulgated lawfully as emergency rules under an exception to the Louisiana Act's rulemaking requirement, L.S.A. R.S. 49:953(B).

## II. *Justiciability*

■ Article III of the Constitution confines the exercise of federal judicial power to "cases and controversies," requiring that plaintiffs invoking federal jurisdiction establish standing to sue for the relief they seek. *Valley Forge Christian College v. Americans for Separation of Church and State,* —— U.S. ——, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Where the actions of a federal agency are challenged, § 702 of the APA provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The Supreme Court has construed this language to require a two-step inquiry, one part constitutional, the other prudential. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 39 n.19, 96 S.Ct. 1917, 1925 n.19, 48 L.Ed.2d 450 (1976); *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). The constitutional aspect of the standing inquiry requires that the plaintiff demonstrate sufficient personal stake in the outcome of the controversy to assure "concrete adverseness." *Baker v. Carr, supra,* 369 U.S. at 204, 82 S.Ct. at 703. The nonconstitutional, prudential component is satisfied by a showing that the plaintiff's interest lies "arguably within the zone of interests to be protected or regulated by the statute in question." *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The latter requirement is plainly met here; plaintiffs' interests as AFDC beneficiaries fall within the zone of interests arising under the AFDC statute. *See United States v. SCRAP, supra,* 412 U.S. at 686 n.13, 93 S.Ct. at 2415 n.13. Whether the constitutional threshold is also satisfied merits closer examination.

■ The Supreme Court recently reemphasized that Article III mandates that a federal plaintiff show an actual or threatened injury, plus some casual connection between the injury and the defendant's conduct. *Valley Forge Christian College v. Americans for Separation of Church and State, Inc., supra,* —— U.S. at ——, 102 S.Ct. at 758. Specifically, the plaintiff must demonstrate that the injury is fairly traceable to the challenged action, and likely to be redressed by a favorable decision. *Id.; Simon v. Eastern Kentucky Welfare Rights Org., supra,* 426 U.S. at 38, 96 S.Ct. at 1917; *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

■ Two classes of injuries are alleged here. The organizational plaintiffs, LHC and WRPAP, assert on behalf of themselves and their members that they were denied the opportunity to comment on proposed regulations in accordance with customary § 553 procedures. Both groups are composed primarily of recipients of AFDC and other government assistance.[5] Associations such as LHC and WRPAP, of course, may have standing to pursue claims on behalf of themselves or their members. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. at 2212; *Rite-Research Improves the Environment, Inc. v. Costle,* 650 F.2d 1312, 1319 (5th Cir. 1981). In this case, the organizations and their members are alleged to have sustained the same injury: denial of participation in the rulemaking process. No loss of AFDC benefits, actual or threatened, is alleged to

---

**5.** See affidavits of Barbara Major and Viola Francois, plaintiffs' Ex. 2 and 3.

have been suffered by a single member of either group. Although injuries to noneconomic interests may be sufficient to confer standing, *Sierra Club v. Morton, supra,* 405 U.S. at 734, 92 S.Ct. at 1367–68, plaintiffs cite no case granting standing solely to remedy denial of an opportunity to comment on proposed regulations. In a case raising the same challenge to regulations implementing OBRA changes in AFDC, the Third Circuit recently questioned the standing of similar organizations. *Philadelphia Citizens in Action v. Schweiker,* 669 F.2d 877, 880 n.1 (3d Cir. 1982). Nevertheless, the court permitted the plaintiffs to proceed, noting:

> Although we might not, as an initial trier of fact, have ourselves been persuaded by the testimony that an injury in fact had been demonstrated, we do not believe that the evidence on the record was insufficient as a matter of law to support a conclusion that the plaintiffs here do have standing to challenge the regulations in question.

*Id.* In this case I find that the mere loss of an opportunity to comment on proposed rules pursuant to statutory procedures does not amount to the sort of "distinct and palpable injury" sufficient to invoke the authority of a federal court. *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. While the plaintiff organizations and their members maintain an unquestionable interest in the subject matter of the new AFDC regulations, they assert no loss of the substantive benefits of the AFDC program. Their claim is only that they were omitted from the procedure which developed rules implementing Congressional guidelines for allocation of those benefits. In the absence of some allegation of a change in their members' AFDC status as a result of the new regulations, I conclude that LHC and WRPAP lack standing to sue for the statutory violations alleged.

■ Plaintiff Wells alleges that in addition to being unlawfully denied an opportunity to comment, she was officially notified in November 1981 that her AFDC benefits would be terminated within the next month. Nothing in the record contradicts this allegation. In explanation, she was advised that under new rules she was disqualified from eligibility because of the income of her husband, the stepfather of her two children. Essentially, her claim is that her AFDC benefits were terminated by regulations issued in violation of statutory procedures requiring pre-promulgation notice and comment. This injury is directly attributable to the Secretary, who cannot administer the AFDC program without lawfully promulgating the necessary regulations. *See* 42 U.S.C. § 1302; *Mandley v. Trainor,* 545 F.2d 1062, 1072 (7th Cir. 1976), *rev'd on other grounds sub nom. Quern v. Mandley,* 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978); *see also* 5 U.S.C. § 552(a)(1)(D); [6] *Morton v. Ruiz,* 415 U.S. 199, 232–33, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974). Although her benefits may not ultimately be restored due to a substantive policy decision by Congress, Mrs. Wells' alleged injury—the withdrawal of assistance through improperly promulgated regulations—would be remedied by a decision setting aside the regulations as issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Mrs. Wells' allegations thus are sufficient to establish her standing to sue under Article III. To deny her standing in these circumstances would insulate agency compliance with APA rulemaking procedures from judicial review whenever agency rules implement policy choices by Congress.

■ An affidavit in the record by a state AFDC administrator [7] suggests that Mrs. Wells will "probably" be recertified for benefits shortly because of a change in her

---

**6.** 5 U.S.C. § 552(a)(1)(D) provides:
(a) Each agency shall make available to the public information as follows:
(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—
* * * * * *

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; ...

**7.** See affidavit of Jerry Galloway.

circumstances. The mere possibility of a reversal of the previous decision to terminate Mrs. Wells' assistance does not render her claim moot. Moreover, even if she is recertified, "it is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, — U.S. —, —, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). Given the evident fluctuation of Mrs. Wells' financial circumstances, I am unable to find with assurance that there is no reasonable expectation that withdrawal of assistance under the same regulations will recur. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *see* L. Tribe, American Constitutional Law § 3–14 at 66–67 (1978). Therefore, I conclude that Mrs. Wells' claim remains justiciable even if her benefits are restored.

### III. *Class Certification*

Although she has not specifically moved for class certification, Mrs. Wells has structured her suit as a class action on behalf of all others who may or have had their AFDC benefits reduced under the new regulations. Her complaint asserted that class action status was appropriate under Fed.R.Civ.P. 23(b)(2), which authorizes such actions for declaratory or injunctive relief where the opposing party has acted or refused to act on grounds generally applicable to the class. While it has never directly ruled on the question, *Johnson v. City of Opelousas*, 658 F.2d 1065, 1068–69 n.5 (5th Cir. 1981), the Fifth Circuit has indicated that class actions under Fed.R.Civ.P. 23(b)(2) need not be certified when the declaratory and injunctive relief sought by the individual plaintiff will inure automatically to the benefit of putative class members. *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 812 (5th Cir.

1974); *see also Fernandes v. Limmer*, 663 F.2d 619, 623 n.1 (5th Cir. 1981). This position is in accord with the majority of courts.[8]

Without suggesting a view on whether certification of 23(b)(2) class actions may be withheld as a matter of course whenever an individual action would suffice to obtain the relief sought, I find class certification inappropriate here. Plaintiffs assert a facial attack on regulations administered by public officials sworn to uphold the law. A decision granting injunctive and declaratory relief clearly would benefit other persons in Mrs. Wells' position. *See Ruhe v. Block*, 507 F.Supp. 1290, 1295 (E.D. Va.1981). Since I have determined that her individual claim is not moot, the class need not be certified to preserve a live controversy. Furthermore, because this action has been submitted for trial on documents, there are no special difficulties with discovery or admissibility of evidence that might warrant class certification. In these circumstances, class action status would serve no useful purpose. Accordingly, I decline to certify the plaintiff class.

### IV. *The "Good Cause" Exceptions*

Mrs. Wells challenges the Secretary's decision to dispense with the notice and comment rulemaking procedures set forth in § 553(b) and (c), and his failure to allow for a thirty-day interval between publication of the interim rules and their effective date, as required by § 553(d). Separate exceptions to both requirements excuse noncompliance where the agency establishes "good cause." Section 553(b)(B), quoted above, permits agencies to bypass notice and comment rulemaking when good cause exists to find such procedures impracticable, unnecessary, or contrary to the public interest. Section 553(d)(3) permits agency rules to

---

**8.** *James v. Ball*, 613 F.2d 180, 186 (9th Cir. 1979), *rev'd on other grounds*, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981); *Davis v. Smith*, 607 F.2d 535, 540 (2d Cir. 1978); *Sandford v. R. L. Coleman Realty Co.*, 573 F.2d 173, 178 (4th Cir. 1978); *Craft v. Memphis Light Gas and Water Div.*, 534 F.2d 684, 686 (6th Cir. 1976), *aff'd* 436 U.S. 1, 98 S.Ct. 1554, 56

L.Ed.2d 30 (1978); *Carter v. Butz*, 479 F.2d 1084, 1089 (3d Cir. 1973); *Martinez v. Richardson*, 472 F.2d 1121, 1127 (10th Cir. 1973); *Ihrke v. Northern States Power Co.*, 459 F.2d 566 (8th Cir.), *vacated as moot* 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972); *contra Vickers v. Trainor*, 546 F.2d 739, 747 (7th Cir. 1976).

become effective upon publication "for good cause found and published with the rule." The Secretary admits that notice and comment requirements were not satisfied, and that the new regulations became effective only nine days after their publication, but maintains that good cause existed to abbreviate ordinary rulemaking procedures. Mrs. Wells argues that no such good cause existed.

The Secretary relies on his statement accompanying the disputed regulations, which asserted that the use of § 553 notice and comment procedures would preclude implementation of the OBRA AFDC amendments by the October 1, 1981 deadline. According to the statement, states needed immediate guidance from HHS in order to comply with the OBRA deadline, along with assurance that the instructions they received would not be extensively altered, to their great expense, in "mid-stream." The Secretary estimated that two billion dollars would be saved by implementing OBRA through expedited procedures, thus assisting in fulfillment of OBRA's goal of curtailing inflation through budgetary constraints. Citing § 553(b)(B), the statement concluded that good cause existed to dispense with rulemaking procedures.[9]

Before turning to the merits of the Secretary's claim of exemption, two preliminary issues must be resolved. First, although the Secretary's statement did not explicitly cite § 553(d)(3), this oversight does not preclude claiming the exemption if good cause is in fact present to forgo the thirty day waiting period requirement. Even where an agency has failed to publish the required finding of good cause with the rule, it has been permitted to rely on the exception, the omission being characterized as "but a technical violation of normal procedures . . . ." *Nader v. Sawhill,* 514 F.2d 1064, 1068 (Em.App.1975); *see Texaco, Inc. v. Federal Energy Administration,* 531 F.2d 1071, 1082 (Em.App.1976); *DeRieux v. Five Smiths, Inc.,* 499 F.2d 1321, 1333 (Em.App.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). Here, the Secretary expressly found good cause and offered detailed reasoning in support of this finding. On the facts of this case, the same reasoning applies under either of the two § 553 good cause exceptions. Thus, as a consequence of the Secretary's statement Mrs. Wells and other interested persons were fully apprised of the basis for the Secretary's decision that good cause was present to provide that the regulations would take effect within nine days of their publication.

---

**9.** The full text of the Secretary's statement is published with the regulations at 46 Fed.Reg. 46750 (September 21, 1981):

These interim regulations are effective October 1, 1981, the effective date required by Pub.L. 97–35. Since the legislation was not signed into law until August 13, 1981, it was not feasible to issue these rules under a Notice of Proposed Rule Making as this would have delayed issuance of final rules until well past October 1, 1981. Since the amendments made by Pub.L. 97–35 will require many changes in State AFDC plans and agency procedures, States must have some reasonable assurance that new Federal rules under which these changes are to be implemented will not change in "mid-stream." Furthermore, the State costs of sequential changes in the program because of abrupt changes in Federal rules will be significantly higher than if the changes are made by States in a planned and orderly manner. The only way to assure States that significant changes in Federal policy will not be made after they

have begun to implement the provisions of the new statute is to issue interim rules.

In addition, publishing interim rules will permit the State and Federal governments to capture the greatest amount of cost savings from these provisions and this will be to the benefit of the public. We anticipate that the savings to Federal and State governments from prompt implementation of these amendments will be about $2 billion and represent a substantial factor in the President's efforts to curb inflation and revitalize the economy. Accordingly, we believe that under 5 U.S.C. 553(b)(B) good cause exists for waiver of Notice of Proposed Rulemaking since issuance of proposed rules would be impracticable and not in the public interest.

While notice of proposed rulemaking is being waived, we are interested in comments and advice regarding changes which should be made to these interim rules. We will review any comments on these rules which we receive on or before November 20, 1981, and will publish the final rules with any necessary changes.

No citation of § 553(d)(3) was necessary to claim the exemption.

■ Second, the Secretary argues that his determination that good cause existed to dispense with § 553 procedures is to be reviewed only for abuse of discretion. I conclude that I am bound by the Fifth Circuit's approach in *United States Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir.) *clarified* 598 F.2d 915 (1979) and *City of Waco v. EPA*, 620 F.2d 84 (5th Cir. 1980). In both cases the court subjected the agency's determination of good cause to independent review, examining the reasons proffered and rejecting them as inadequate. This standard of review is especially appropriate here, since Mrs. Wells alleges the legal insufficiency of the Secretary's assertion of good cause, an issue of statutory interpretation traditionally committed to courts.

### A. Section 553(b)(B)

■ It is axiomatic that exceptions to the APA's rulemaking requirements are to be narrowly construed. *E.g., United States Steel Corp. v. EPA, supra*, 595 F.2d at 214. Yet the good cause exceptions were included in the APA to ensure that its procedural strictures did not thwart achievement of an agency's substantive mission. Statements in the legislative history of the APA confirm this intention. The Senate report on the APA defines § 553(b)(B)'s use of the term "impracticable" as referring to "a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings." S.Doc.No. 248, 79 Cong., 2d Sess. 200 (1946). Consistent with this purpose, courts have upheld agency assertions of good cause under § 553(b)(B) in circumstances where the agency had no practicable option but to dispense with rulemaking procedures. *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C.Cir.1981); *Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1321 (8th Cir. 1981); *Nader v. Sawhill,*

*supra*, 514 F.2d at 1068; *Reeves v. Simon*, 507 F.2d 455 (Em.App.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975).

As noted above, the Third Circuit confronted virtually the same challenge to the new AFDC regulations in *Philadelphia Citizens in Action v. Schweiker, supra.* Reversing a district court order granting declaratory and injunctive relief, the court ruled that the Secretary had met his burden of establishing good cause under § 553(b)(B). The court acknowledged that its earlier decisions had adopted perhaps the most narrow construction of the § 553(b)(B) exception, *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979); *American Iron & Steel Institute v. EPA*, 568 F.2d 284 (3d Cir. 1977), but found that the circumstances nevertheless fell within its scope. The court first rejected the district court's position that shortness of time can never constitute good cause to bypass notice and comment rulemaking procedures. Distinguishing its decisions in *American Iron & Steel Institute* and *Sharon Steel*, the court identified dilatory or otherwise improper agency conduct as the decisive factor in rejecting an agency's claim of good cause. In *American Iron & Steel Institute*, the court pointed out, the EPA had been guilty of a three-year delay in promulgating the proposed rules. In *Sharon Steel*, although the schedule was more stringent, the agency could have published the substance of the proposed rules before the statutory deadline. In the case before it, the court determined that earlier publication followed by notice and comment procedures would have rendered compliance with the Congressionally mandated October 1, 1981 deadline impossible. *Id.* at 885.

Second, the court observed that although § 553(a)(2) [10] exempts matters involving federal grants or benefits from rulemaking procedures, HHS had voluntarily elected to comply with these procedures in 1971. [11]

---

**10.** 5 U.S.C. § 553(a)(2) provides:
(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

&ast; &ast; &ast; &ast; &ast; &ast;

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

**11.** See 36 Fed.Reg. 2532 (1971).

Since HHS's rulemaking obligations were therefore extrastatutory, the court reasoned that no inference could be drawn that the good cause exemption should not apply from the Congress' failure to expressly exempt regulations implementing OBRA from the APA. *Id.* at 885–86.

Finally, the court overturned the district court's finding that the Secretary abused his discretion by determining that ordinary rulemaking procedures were "impracticable." While the court agreed that the alternatives proposed by the district court might have allowed the rules to be promulgated within the period prescribed by Congress, the court held that the Secretary's finding to the contrary did not constitute an abuse of discretion. *Id.* at 886–87.

A similar result was reached by the United States District Court for the Southern District of Ohio in *Ohio State Consumer Education Ass'n v. Schweiker,* No. 1–81–933 (S.D.Ohio Jan. 4, 1982), another case challenging regulations implementing OBRA. The court rejected the plaintiffs' claim that the Secretary failed to establish good cause, declaring that "[i]t is difficult to conceive of a situation where congressionally imposed time constraints have been of greater importance than in the instant case." Mem. Op. at 5. The court emphasized that the Secretary was under no obligation to issue regulations in advance of enactment of legislation.

After careful consideration of these opinions, the evidence submitted here and the arguments of counsel, I perceive no basis for differing with either court. In my judgment, the unique circumstances demonstrated by the Secretary in this case suffice to establish good cause, as that term has been defined by the Fifth Circuit. The leading Fifth Circuit case is *United States Steel Corp. v. EPA, supra,* where the court heard a challenge to EPA rules promulgated without notice and comment. The rules in question were issued pursuant to the 1977 amendments to the Clean Air Act, 42 U.S.C. §§ 7401–7642.[12] The amendments required states to designate areas within their borders not complying with federal air quality standards. Upon receipt of state designations, the EPA had sixty days to examine the state lists, modify them to ensure accuracy, and publish the revised designations in the Federal Register. 42 U.S.C. § 7407(d). The EPA conceded that the designations were rules and that they were promulgated without notice and comment procedures, but claimed the protection of the § 553(b)(B) exception. The agency argued that adherence to both the Clean Air Act's timetable and the APA was impossible. The court responded that the existence of a statutory deadline alone did not warrant a finding of good cause, explaining that, "[t]he deadline is a factor to be considered, but the agency must still show the impracticability of affording notice and comment." *United States Steel Corp. v. EPA, supra,* 595 F.2d at 213. The court noted that the EPA "did not regard the statutory deadline as sacrosanct, since the nonattainment list was not published until a full month after the deadline." *Id.* (footnote omitted). The court also observed that states had little need for EPA's guidance, since the EPA rule was based on submissions by the states. Moreover, the court suggested that the initial lists submitted by the states could have been published to allow for public comment while the EPA prepared the final designations.[13]

---

**12.** The difficulty of resolving questions involving the existence of good cause is illustrated by the division among the federal courts of appeals in challenges to the EPA's bypassing of notice and comment procedures in designating areas not meeting federal air quality standards. In finding no good cause in *United States Steel,* the Fifth Circuit was joined by the Eighth, Ninth, District of Columbia and Third Circuits. *United States Steel Corp. v. EPA,* 649 F.2d 572 (8th Cir. 1981); *Western Oil & Gas Ass'n v. EPA,* 633 F.2d 803 (9th Cir. 1980); *New Jersey v. EPA,* 626 F.2d 1038 (D.C.Cir.1980); *Sharon*

*Steel Corp. v. EPA,* 597 F.2d 377 (3d Cir. 1979). The Sixth and Seventh Circuits reached the opposite result. *Republic Steel Corp. v. Costle,* 621 F.2d 797 (6th Cir. 1980); *United States Steel Corp. v. EPA,* 605 F.2d 283 (7th Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

**13.** The Fifth Circuit closely followed *United States Steel* in another case challenging the EPA's designation of nonattainment areas, *City of Waco v. EPA, supra.*

A convergence of factors readily distinguishes the EPA's situation in *United States Steel* from the circumstances confronting the Secretary in this case. While the EPA was directed to modify lists of areas submitted by the states within sixty days, the Secretary was allowed only forty-nine days to compose and promulgate extensive and intricate rules implementing wholesale changes in AFDC policy. I find that the October 1, 1981 deadline, if not regarded as sacrosanct, at least served as the overriding motivation for the Secretary and HHS officials in determining how the new rules would be promulgated. Aware in May that adequate time would not likely be available for notice and comment procedures, the Secretary engaged in a good faith endeavor to involve interested groups in preparing preliminary drafts. HHS officials prudently anticipated some of OBRA's changes and prepared to draft the new regulations during the months immediately preceding OBRA's passage. A working draft was prepared by the date OBRA was signed, August 13, 1981, and the Secretary approved the final draft on September 3. Following mandatory review of their regulatory impact by the Office of Management and Budget, the regulations were published on September 21. Based on the testimony of the HHS official in charge of drafting the regulations, Michael de Marr, I find that the department acted diligently in preparing and promulgating the challenged rules.

Unlike the EPA in *United States Steel*, the Secretary here had no feasible alternative to dispensing with notice and comment procedures. Based on his experience, Mr. de Marr testified that such procedures would consume at least six months, a figure I find to be a reasonable estimate of the length of the notice and comment rulemaking process. Since OBRA left certain policy choices to the discretion of the Secretary, *Philadelphia Citizens in Action v. Schweiker, supra,* 669 F.2d at 884, the states needed HHS's guidance in adapting their programs in accordance with its provisions. Failure of state programs to conform to OBRA requirements by the October 1 deadline posed the risk of loss of federal support.

Furthermore, the states needed guidance more reliable than proposed rules subject to revision following a comment period. As the Fifth Circuit recognized in *United States Steel*, changes in regulations are more likely to result from notice and comment rulemaking than from a post-promulgation comment period, as the Secretary provided here. The Secretary found that the cost associated with implementation of the new rules would be reduced significantly if states were spared the expense of readjusting their programs to comply with changes made in federal regulations after a comment period. In addition, the Secretary estimated that prompt and uniform implementation of the OBRA changes would save about two billion dollars. With no evidence in the record disputing this figure, I find it to be a reasonable approximation of the financial consequences at stake. Haphazard or tentative implementation, of course, would result in the loss of this opportunity for substantial savings, thereby frustrating one of OBRA's prime objectives.

Despite Mrs. Wells' arguments to the contrary, OBRA's provision of an exemption from the October 1 deadline when state agencies are barred by state law from conforming to OBRA by that date does not diminish the plain intention of Congress that OBRA be rapidly implemented. Congress modified the deadline only to accommodate state programs prevented from compliance by conflicting state law, not by federal administrative inertia. Congress' will that OBRA's alterations of the AFDC program be immediately instituted was unequivocal. As the Third Circuit stated, "Congress, by setting an effective date so close to the date of enactment, expressed its belief that implementation of the amendments to the AFDC program was urgent." *Philadelphia Citizens in Action v. Schweiker, supra,* 669 F.2d at 885.

Mrs. Wells' suggestion that a notice of proposed rulemaking could have been published on August 13, 1981, the date a preliminary draft was sent to state welfare administrators, is untenable. First, it ignores Mr. de Marr's testimony that notice and comment proceedings would have taken

six months to complete. Second, it overlooks the unfinished state of the preliminary draft. See federal defendant's Ex. 1. I find that not only was the draft in a form unsuitable for publication on August 13, but also that it failed to resolve numerous issues calling for the exercise of the Secretary's discretion. As Mr. de Marr testified, the draft also contained abundant errors. In short, the substance of the proposed rules had yet to be fully determined. I find as a matter of fact that publication of the August 13 draft or a similar one at that juncture of the revised rules' preparation would have been uninformative and possibly misleading.

■■■ Likewise, I cannot accept Mrs. Wells' alternate contention that the Secretary was obligated to issue regulations implementing OBRA before it was signed into law. Apart from questions it raises regarding the Secretary's authority, this suggestion attributes undue predictability to the legislative process. What in hindsight may seem an inevitable result in foresight may have been an inscrutable mystery, particularly when the subject of attention is Congressional debate over the federal budget. Certainly no agency head can be required to act based on conjecture regarding the outcome of Congressional deliberations. *See Philadelphia Citizens in Action v. Schweiker, supra,* 669 F.2d at 884 n.7; *Ohio State Consumer Education Ass'n v. Schweiker, supra,* Mem. Op. at 5.

The Secretary argues that, regardless of the presence of good cause, his department was not compelled to abide by § 553 because § 553(a)(2)'s exemption from rulemaking procedures of matters pertaining to federal grants and benefits. Urging that I disregard case law to the contrary, *National Welfare Rights Org. v. Mathews,* 533 F.2d 637, 646 (D.C.Cir.1976), the Secretary contends that his department is no longer bound by a 1971 commitment to voluntarily follow § 553 procedures. 36 Fed.Reg. 2532 (1971). Because of my disposition of the Secretary's claim under the § 553(b)(B) good cause exception, I need not reach this issue. Like the Third Circuit, however, I note that the voluntary, nonstatutory character of the Secretary's obligation defeats

any inference that Congress' failure to expressly exempt OBRA from the APA reflected an intention that HHS should follow § 553. *Philadelphia Citizens in Action v. Schweiker, supra,* 669 F.2d at 885–86. Congress had already exempted AFDC regulations from § 553; any obligation to comply had been assumed by the Secretary.

Though cognizant of the narrowness of the § 553(b)(B) exemption, in this instance I am not hesitant to conclude that the Secretary acted with good cause in electing to forgo notice and comment rulemaking procedures. Despite the diligence of HHS officials, a singular blend of circumstances—the imminence of the statutory deadline, the scope of the task and the consequences of failure—left the Secretary with little choice but to dispense with notice and comment procedures. *See Council of Southern Mountains, Inc. v. Donovan, supra,* 653 F.2d at 581–582. Strict adherence to the department's pledge to follow § 553 would have been tantamount to an abdication of the Secretary's responsibility to oversee the prompt implementation of OBRA.

**B.   Section 553(d)(3)**

The new AFDC regulations, published on September 21, 1981, were made effective on October 1, the effective date of OBRA. Mrs. Wells asserts that this timetable violated § 553(d) of the APA, which requires that rules be published not less than thirty days before their effective date. The Secretary argues that § 553(d)(3)'s good cause exception authorized acceleration of the effective date of the rules in this case.

■■■ A demonstration of good cause under § 553(b)(B) does not mean that the applicability of the § 553(d)(3) exemption need not also be considered where the challenged rules become effective in less than thirty days. As the Senate Report on the APA states, "[w]here public procedures are omitted as authorized in certain cases [§ 553(d)] does not thereby become inoperative." S.Doc.No.248, *supra,* at 201. The report notes that the purpose of the thirty day interval is to "afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other

action which the issuance of rules may prompt." *Id.*

In *United States Steel*, the question of the applicability of § 553(d)(3) was not raised before the Fifth Circuit. *United States Steel Corp. v. EPA, supra*, 595 F.2d at 213 n.13. However, in an earlier case, *Clay Broadcasting Corp. of Texas v. United States*, 464 F.2d 1313 (5th Cir. 1972), *rev'd on other grounds sub nom. National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the court excused the Federal Communication Commission's noncompliance with the thirty day waiting period on the basis of § 553(d)(3)'s good cause exception. The Commission cited three factors in support of its invocation of the exception: (1) widespread notice in fact to the affected parties; (2) the need for a first of the month effective date for administrative proration of annual fees; and (3) Congress' intention that the challenged rule, a schedule of user fees, become effective as soon as reasonably possible. The court found these reasons sufficient to justify the Commission's resort to the § 553(d)(3) exception. *Id.* at 1320. By this standard, the circumstances of this case are at least as worthy of the exception. As outlined above, with narrow exceptions, Congress mandated that OBRA was to become effective on October 1, 1981. Acting as expeditiously as reasonably possible, the Secretary was able to issue implementing regulations on September 21, 1981. The circumstances precluded honoring the thirty day waiting period prescribed by § 553(d). In view of Congress' aim of implementing OBRA by October 1, I conclude that the Secretary had good cause

to provide that the regulations would become effective on that date.[14]

## V. *Pendent Party Jurisdiction*

Mrs. Wells' second claim alleges that George Fischer, Secretary of the Louisiana Department of Health and Human Resources, violated the Louisiana Administrative Procedure Act, L.S.A.R.S. 49:951 et seq., when he promulgated state regulations conforming to OBRA without following notice and comment procedures. The Secretary answers that the circumstances justified his invocation of the emergency exception to the state Act's rulemaking requirements. These contentions neglect a vital threshold issue: whether the exercise of federal jurisdiction to resolve this state law issue is appropriate.

Mrs. Wells alleges that this court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, which vests district courts with jurisdiction over all actions "arising under the Constitution, laws, or treaties of the United States."[15] She suggests that her state law claim falls within the court's pendent jurisdiction. The doctrine of pendent jurisdiction confers discretionary authority upon a federal court to hear claims for which there is no independent basis for federal jurisdiction in conjunction with its hearing of related federal claims. The leading modern case outlining the dimensions of this power is *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), where the Supreme Court held that federal courts had authority to consider federal and nonfederal claims together in a single action when they constituted one Article III "case." The

---

**14.** At least one court, citing the omission of § 553(b)(B)'s qualifying language "impracticable, unnecessary, or contrary to the public interest" in § 553(d)(3), has suggested that § 553(d)(3) is broader in scope than 553(b)(B). *United States Steel Corp. v. EPA, supra*, 605 F.2d at 289–90. Some commentators have urged that the two exceptions should be treated as similar in scope. 1 K. Davis, Administrative Law Treatise § 6.29 at 590 (2d ed. 1978); Note, *The "Good Cause" Exceptions: Danger to Notice and Comment Requirements Under the Administrative Procedure Act*, 68 Geo.L.J. 765, 772 (1980). Because in my view the circumstances here satisfy the requirements of either

construction, I do not reach this issue. *Northwest Airlines, Inc. v. Goldschmidt, supra*, 645 F.2d at 1320–21.

In addition, because of my conclusion that good cause justified the Secretary's action, I need not determine whether § 553(b)(A)'s exception for interpretative rules is applicable.

**15.** Plaintiffs have also alleged jurisdiction under 28 U.S.C. § 1343(3) and (4). Since the APA is not an Act providing for "equal rights" or "civil rights," jurisdiction does not lie under either subsection. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

Court explained that the Article III requirement was satisfied when the federal and nonfederal claims derive from a "common nucleus of operative fact." *Id.* at 725, 86 S.Ct. at 1138. The Court then set forth an assortment of factors to be considered in deciding whether to exercise pendent jurisdiction over the nonfederal claims.

Mrs. Wells' complaint, however, invokes pendent jurisdiction not only to add a state law claim but also to join Secretary Fischer, the party against whom the claim is asserted. This extension of pendent jurisdiction theory is known as pendent party jurisdiction. The Supreme Court explored its validity in *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), but declined to formulate a general rule. Instead, the Court announced a methodology for deciding whether its exercise was permissible in individual cases. The Court stated that before engaging in the discretionary weighing of the *Gibbs* criteria, "a federal court must satisfy itself not only that Art. III permits it [pendent party jurisdiction], but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence." *Id.* at 18, 96 S.Ct. at 2422. *See North Dakota v. Merchants National Bank & Trust Co.,* 634 F.2d 368 (8th Cir. 1980); *Boudreaux v. Puckett,* 611 F.2d 1028 (5th Cir. 1980).

In this action, Mrs. Wells' state claim shares a common nucleus of operative fact with her clearly substantial federal claim under the APA, thus satisfying Article III minima. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 371, 98 S.Ct. 2396, 2401, 57 L.Ed.2d 274 (1978); *Aldinger v. Howard, supra,* 427 U.S. at 13, 96 S.Ct. at 2420. The jurisdictional statute relied upon by Mrs. Wells, 28 U.S.C. § 1331, offers little clue concerning Congress' attitude regarding joinder of the state defendant. *North Dakota v. Merchants National Bank & Trust Co., supra,* 634 F.2d at 373. Unlike *Aldinger,* where the Court concluded that Congress had indicated its intention that counties not be subject to pendent party jurisdiction under 28 U.S.C. § 1343(3), Congress here apparently has not expressly or impliedly negated the use of pendent party jurisdiction to include the Secretary

in this lawsuit. Therefore, with no firm barrier to the assumption of jurisdiction under *Aldinger,* I turn to application of the *Gibbs* criteria.

*Gibbs* established that pendent jurisdiction is "a doctrine of discretion, not of plaintiff's right." *Id.* 383 U.S. at 726, 86 S.Ct. at 1139. Factors to be considered in exercising this discretion include convenience to litigants, judicial economy, the risk of jury confusion, and the interests of comity. The Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.* In a later case, the Court explained "the rationale of *Gibbs* centers upon considerations of comity and the desirability of having a reliable and final determination of the state claim by state courts having more familiarity with the controlling principles and the authority to render a final judgment." *Hagans v. Lavine,* 415 U.S. 528, 548, 94 S.Ct. 1372, 1385, 39 L.Ed.2d 577 (1974).

Mrs. Wells contends that the Secretary failed to abide by the rulemaking requirements of § 953(A) of the Louisiana Administrative Procedure Act, while the Secretary relies on the § 953(B) exception, which permits a state agency to forgo rulemaking procedures where it finds "imminent peril to the public health, safety, or welfare." The Secretary argues that the threatened loss of federal AFDC funds for failure to comply with OBRA constituted an emergency within the ambit of the exception. Though arising in the context of AFDC regulations, this question is purely an issue of state administrative law. No Louisiana court has previously construed the § 953(B) exception, and no legislative history was recorded in connection with its passage. Thus, no state guidance exists on what constitutes "imminent peril" or what the term "welfare" encompasses. Where the exception is inapplicable, state courts have not had occasion to indicate whether a violation of § 953(A) is amenable to correction by means other than full notice and comment procedures. The ramifications of a decision on the exception's breadth will

undoubtedly transcend this litigation; the operation of every Louisiana agency is potentially affected. In these circumstances, I believe that the difficult and unsettled state law issue raised by Mrs. Wells' claim is best left for resolution by a Louisiana court. *See Moor v. County of Alameda,* 411 U.S. 693, 716, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973); *Bricklayers Fringe Benefit Funds v. North Perry Baptist Church of Pontiac,* 590 F.2d 207, 209 (6th Cir.), *cert. denied,* 444 U.S. 834, 100 S.Ct. 66, 62 L.Ed.2d 43 (1979); *Brown v. Knox,* 547 F.2d 900, 903 (5th Cir.); *cert. denied,* 432 U.S. 906, 97 S.Ct. 2950–51, 53 L.Ed.2d 1078 (1977); *National Market Reports, Inc. v. Brown,* 443 F.Supp. 1301, 1306 (S.D.W.Va. 1978); *Aiello v. City of Wilmington,* 426 F.Supp. 1272, 1295 (D.Del.1976).

No countervailing considerations warrant my assuming jurisdiction. Although it would be convenient for Mrs. Wells to have all her claims heard in one proceeding, any inconvenience caused by dismissal here is comparatively slight, since all evidence in this consolidated hearing on preliminary and permanent injunctive relief is documentary. No live witnesses must be produced at a second proceeding. Judicial economy also is not seriously disserved by reinstituting this action in state court. There is little overlap in the evidence adduced by the state and federal defendants. The federal and state claims, though related enough to derive from a common nucleus of operative fact, require separate evidence regarding the operation of state and federal agencies. In addition, any concern for delay is outweighed by the prospect of a "surer-footed" reading of state law.

Reinforcing my view that dismissal of the state law claim is proper in this case is Mrs. Wells' reliance on a pendent party theory to include the state defendant. The Secretary is not charged with any violation of federal law, and is not otherwise subject to federal jurisdiction for violation of state law, but has been joined in this litigation in an effort to compel him to litigate a novel question of state administrative law. Comity concerns inherent in resolving such a question are compounded when it is raised by resort to the fullest extension of the scope of federal question jurisdiction. Restraint, not activism, is advisable "in federal decision of complex and unclear state law issues." *Finch v. Mississippi State Medical Ass'n.,* 585 F.2d 765, 777 (5th Cir. 1978) (surveying various doctrines of restraint.)

I therefore conclude, in the exercise of my discretion, that the ends of justice and the interests of the parties are best served by dismissing Mrs. Wells state law claim and permitting her to seek a definitive ruling in state court. Accordingly,

IT IS ORDERED that the claims of the Louisiana Hunger Coalition and the Welfare Rights and Public Assistance Program be and are hereby DENIED for lack of standing.

IT IS FURTHER ORDERED that class certification of this action be and is hereby DENIED.

IT IS FURTHER ORDERED that Jeanette Wells' claim for declaratory and injunctive relief against defendant Richard Schweiker be and is hereby DENIED.

IT IS FURTHER ORDERED that Jeanette Wells' claim for declaratory and injunctive relief against defendant George Fischer be and is hereby DISMISSED.